1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                      Richmond Division

4

5    ACMA USA, INC.,

6           Plaintiff,                    Civil Action No.

7                                         3:08CV71-HEH

8    vs

9

10   SUREFIL, LLC,

11          Defendant.

12   _____/

13

14                    VIDEOTAPE DEPOSITION

15

16   DEPONENT:  MARTIN CHISM

17   DATE:      August 20, 2008

18   TIME:      10:13 a.m.

19   LOCATION:  2810 East Beltline Lane, N.E.

20              Grand Rapids, Michigan

21   REPORTER:  Rebecca S. Grubba, CSR

22

23

24

25

```
 1  APPEARANCES:

 2

 3      MARCHANT, HONEY & BALDWIN, L.L.P.

 4      BY:  W. R. Baldwin, III, P.C.

 5           5600 Grove Avenue

 6           Richmond, VA  23226

 7           (804) 285-3888

 8             Appearing on behalf of Plaintiff

 9

10      DURRETTE BRADSHAW, PLC

11      BY:  Christine A. Williams

12           Main Street Centre - Twentieth Floor

13           600 East Main Street

14           Richmond, VA  23219

15           (804) 775-6838

16             Appearing on behalf of Defendant

17

18      ALSO PRESENT:  Gary J. Pierce

19                     Linda Crane, Videographer

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS:                                    PAGE

 3     MARTIN CHISM

 4     Examination by Mr. Baldwin                 5

 5     Examination by Ms. Williams               92

 6     Re-Examination by Mr. Baldwin            126

 7

 8                  E X H I B I T S

 9   NO.                DESCRIPTION             PAGE

10   Ex. No. 1    9/29/06 letter and quotation  19

11   Ex. No. 2    Purchase order                23

12   Ex. No. 3    10/05/06 e-mail               24

13   Ex. No. 4    E-mail chain                  25

14   Ex. No. 5    Notes of telephone conferences 34

15   Ex. No. 6    11/19/07 invoice              75

16   Ex. No. 7    E-mail chain                  76

17   Ex. No. 8    E-mail chain                  77

18   Ex. No. 9    Pareto chart                  80

19   Ex. No. 10   2/7/07 e-mail                105

20   Ex. No. 11   E-mail chain                 112

21   Ex. No. 12   E-mail                       114

22   Ex. No. 13   E-mail chain                 115

23   Ex. No. 14   E-mail chain                 116

24   Ex. No. 15   E-mail chain                 116

25              (Exhibits attached)
```

1                     Grand Rapids, Michigan

2                     August 20, 2008

3                     10:13 a.m.

4                          *  *  *

5          VIDEOGRAPHER:  This will be the beginning of the

6   deposition of Martin Chism.  It is August 20th, 2008.  The

7   time is 10:13 a.m. and we're on the record.  And now the

8   attorneys will identify themselves and whom they represent.

9          MR. BALDWIN:  Bill Baldwin, Marchant, Honey &

10  Baldwin, 5600 Grove Avenue, Richmond, Virginia, counsel for

11  ACMA USA, Inc.

12         MS. WILLIAMS:  Christine Williams, Durrette Bradshaw,

13  600 East Main Street, 20th Floor, Richmond, Virginia, counsel

14  for Surefil, LLC, and with me is corporate representative Gary

15  Pierce.

16         VIDEOGRAPHER:  And the court reporter will swear the

17  witness.

18                    (Witness sworn)

19                          *  *  *

20                    MARTIN CHISM,

21  having been first duly sworn to tell the truth, the whole

22  truth, and nothing but the truth, was examined and testified

23  as follows:

24                          *  *  *

25

**Kane & Trap Court Reporting, Inc.**
services@kaneandtrap.com                    **(616) 742-0700**

```
 1                          EXAMINATION

 2         BY MR. BALDWIN:

 3   Q.    Sir, would you please state your name?

 4   A.    Martin Chism.

 5   Q.    And what is your current residence address, Mr. Chism?

 6   A.    330 Plymouth, Southeast, Grand Rapids, Michigan, 49506.

 7   Q.    And where are you currently employed?

 8   A.    Morrison Industrial Equipment.

 9   Q.    And their address, please?

10   A.    My branch is 653 36th Street, Southeast, Grand Rapids.  I

11         believe the zip code is 49548.

12   Q.    And, Mr. Chism, are you a high school graduate?

13   A.    Yes, I am.

14   Q.    Are you also a college graduate?

15   A.    Yes, I am.

16   Q.    What degree do you hold and from where did you graduate,

17         please?

18   A.    I have a degree in business administration, with a

19         concentration in finance from Aquinas College in Grand

20         Rapids.

21   Q.    And do you have any formal education post college?

22   A.    No.

23   Q.    Have you undertaken any particular professional training

24         courses in your time since graduating from college, even if

25         these were not formal degree-granting programs?
```

1  A.    No.

2  Q.    Please summarize -- well, let me stop and say, it's true that

3        you were a former employee of Surefil?

4  A.    Correct.

5  Q.    And would you summarize for me, please, your employment

6        history prior to joining Surefil?

7  A.    On May 15th, 2006, I began with Surefil. I couldn't tell you

8        the exact position it was. It was black belt something,

9        something, something. It was a very long title. Basically I

10     monitored -- I spent two months monitoring Surefil's line one.

11  Q.   If I could -- just one moment. If you could sketch out

12     your employment prior -- after college and before you got to

13     Surefil and then we'll talk about Surefil.

14  A.   I actually graduated college post Surefil.

15  Q.   Oh, okay. So is Surefil your first regular employment?

16  A.   No.

17  Q.   All right. What was your last regular employment prior to

18     joining Surefil?

19  A.   Heartwell Mortgage. I worked in accounting.

20  Q.   And what were your functions there?

21  A.   I scheduled the drafts of loans, handled all the accounts

22     payable. It's been a while. I handled the warehousing of

23     loans. I'm sorry. I'm drawing a blank.

24  Q.   That's all right.

25  A.   I was only there for six months, so --

1  Q.   And you say you joined Surefil May 15th, 2006 and the title of

2       your position was fairly long and complicated?

3  A.   Right.

4  Q.   What was your first tasks at the time you got to Surefil?

5  A.   My first task was line one's production, figuring out why line

6       one produced almost nothing and how we can change that.

7  Q.   Now, there's been prior evidence in this case that at Surefil

8       there are two production lines?

9  A.   Correct.

10 Q.   One of them is referred to as line one and has as its center-

11      piece a filler/capper machine made by a company called Ronchi,

12      R-o-n-c-h-i?

13 A.   Uh-huh.

14 Q.   And then there's line two and the filler/capper machine on

15      that is an ACMA machine, which is the subject of this

16      controversy?

17 A.   Correct.

18 Q.   Okay.  You were talking about your first job was to work on

19      line one with regard to issues the company was experiencing?

20 A.   It was basically line one was, I believe, put together in

21      February of '06 and by May still could not run any production,

22      any sizeable production.  I mean, they would frequently get

23      just a few thousand units out over the course of an eight-hour

24      shift.

25 Q.   And who assigned you to the tasks of working on line one?

1  A.    Bill Hunt.

2  Q.    And Mr. Hunt's the CEO of the company?

3  A.    Correct.

4  Q.    All right.  What did you do to carry out the tasks that you

5        were given by Mr. Hunt with respect to line one?

6  A.    I created a pareto chart of issues with regards to every

7        particular issue that was down.  I spent time in discussion

8        with Rich Brasseur, who is -- who was the head of maintenance

9        at the point in time, trying to figure out why this line was

10       not running and things we could do to fix it.  We did a little

11       bit of small linery(ph) design, such as moving this sensor

12       from here to here or putting a piece of foam sponge in the

13       capper bowl in order to keep caps from stacking up, adjusted

14       variable speed drives to allow for smoother transition of the

15       bottles, and spent a great deal of time with various

16       companies, trying to figure out how to make the Ronchi run

17       better, considering it was an old machine.

18 Q.    Now, you referred to something called a pareto chart?

19 A.    Yes.

20 Q.    Would you tell us, please, what that is?

21 A.    A pareto chart is a list of issues, total occurrences, such

22       as an issue might be a bottle -- or a product overflowing

23       bottles, so that when your shampoo bottle is filling up, too

24       much product is pumped and it overflows and causes you to have

25       to stop the line.  So something similar to that.  You have a

**Kane & Trap Court Reporting, Inc.**

1     list of every single issue. Anytime that there was any

2     downtime for the line whatsoever, this issue would be noted,

3     the duration of the issue. So if this issue was 15 seconds,

4     you noted that. And you'd also note the current run speed of

5     the line. So if line one was running at 100 bottles a minute

6     and you lost 15 seconds of production, then you lost 25

7     bottles, which was also noted through a formula on the front

8     of it.

9           The pareto chart was essentially a spreadsheet, an

10    Excel spreadsheet, with a couple of pages dedicated at the

11    front to graphs and then -- and charts, and then each issue

12    had its own page listing the date, the number of occurrences,

13    the total downtime, and the total units of production lost.

14  Q.   So this would be, if I'm understanding you correctly, a

15     three-dimensional spreadsheet, with a number of work sheets

16     and then a top work sheet that reflected what was on the work

17     sheets behind it?

18  A.   Correct.

19  Q.   And after you created this pareto chart with regard to line

20     one, what did you do with it?

21  A.   Myself, John Watson --

22  Q.   Who is Mr. Watson, please?

23  A.   John Watson was the longest-running plant manager at Surefil.

24     Also the first plant manager at Surefil.

25  Q.   So he was the plant manager when you got there?

1  A.    Correct.

2  Q.    All right.  Go ahead, please.

3  A.    Bill Hunt, Rich Brasseur.  I'm trying to think.  There was

4        probably a couple other people involved as well in our

5        meeting.  But basically we sat down and we went through every

6        issue that had occurred.  We did this in July.  We had done it

7        for about just under two months.  And we looked at every issue

8        and possible solutions, too.  Before this meeting, we had

9        periodic small meetings where we'd say, "Okay, this is a major

10      issue, how can we make this work now?"  But the big deal was

11      at the end of it, we went back and looked at all of the

12      issues.

13  Q.    And as a result of this inquiry made by you, did -- excuse

14      me.  Were there any changes made to line number one?

15  A.    There were some changes.  We removed a lot of sensors.

16      We -- we added an additional capper, but that was actually

17      more for production purposes because we figured we couldn't

18      hand-cap as fast.  The first capper on the Ronchi is a spin

19      cap and they had a snap cap to perform some functions.  So we

20      bought one from E-Pak Machinery.  We -- like I said, we put a

21      foam sponge in the top of the Ronchi capper bowl.

22  Q.    What was the purpose of putting in the foam sponge?

23  A.    The cap shoot that ejects caps into -- before it reaches the

24      spinning capper, a cap comes down a shoot that basically lines

25      them up individually.  And to get to that shoot, it goes

1  through a sorter bowl.  Well, in the sorter bowl, the caps

2  would stack up.  And so if the cap can't enter the shoot, it's

3  stacked up.  So it would jam and production would be halted

4  because of a shortage of caps.  So we put the sponge in there

5  because the sponge would absorb the cap if it was stacked up

6  and kick off the top one.  Basically just a simple absorbency.

7  Q.  And as a result of the efforts that you have described, did

8  Surefil see an improvement in the production on line one?

9  A.  Massively.  We went from running a couple thousand bottles a

10  shift to regularly running 40 or 50,000 bottles a shift.

11  Q.  By what time was the 40 to 50,000 bottles a shift target

12  reached?

13  A.  It took two months from when we started the project.

14  Q.  All right.  So if you could give me a month and a year, that

15  would be helpful.

16  A.  July of 2006.

17  Q.  July of 2006?  Now, with regard to that particular line, was

18  it in place at the time you came to the company?

19  A.  Line one?

20  Q.  Yes.

21  A.  Yes, it was.

22  Q.  Did you have any dealings with any of the people who were

23  involved in providing either the machines used in line one or

24  providing services related to the installation of line one?

25  A.  Yes, after the fact.  But I dealt with every company

1     represented there.

2  Q.   Were there any disputes with any of these companies?

3  A.   Definitely.

4  Q.   If you could name the companies with whom Surefil had disputes

5     with regard to this line one and summarize the nature of each

6     dispute, please.

7  A.   Integrated Packaging Machinery, IPM, would be the first one.

8     IPM did the line design and integration. There are still

9     probably to this day issues going on with them. They wanted

10    to make changes to the line. Whoever was our engineers at the

11    particular time wanted to make changes to the line. Basically

12    it was -- they were actually contracted to make a -- I forget

13    what it was. It was some sort of table that was going to come

14    off of the filler. And they built it and Bill decided he

15    didn't want -- Bill Hunt decided he didn't want it and told

16    them to keep it and he wasn't going to pay for it.

17  Q.   Well, how did it come about that this company --

18  A.   IPM.

19  Q.   -- that IPM did the work that Mr. Hunt said he wasn't going to

20    pay for?

21        MS. WILLIAMS: Objection to form. You can still

22    answer.

23    BY MR. BALDWIN:

24  Q.   Do you know how the company came to do that work, IPM came to

25    do that work?

1  A.    Jeff Bevis and, I want to say, Tim Butcher.  I believe Tim was

2        the plant manager at the time.  Jeff Bevis and Tim Butcher got

3        IPM to do that.  Issued IPM a purchase order and got them to

4        build this table.

5  Q.    And did Mr. Hunt give you a reason why he wasn't going to pay

6        for the table that IPM had constructed?

7            MS. WILLIAMS:  Objection to form.

8            THE WITNESS:  He said he didn't want it anymore.

9        Or he didn't want it to begin with.  I don't remember his

10       specifics.

11     BY MR. BALDWIN:

12  Q.   Were there disputes with any other companies providing either

13       goods or services for line one?

14  A.   Yes.  Domino Amjet.

15  Q.   And what was the nature of that dispute?

16  A.   Our employees were not trained to run it, to run the

17       equipment, and we would frequently -- we would very frequently

18       crash the -- Domino (inaudible) the ink jet coaters.

19          REPORTER:  Domino what?

20          THE WITNESS:  Domino Amjet, A-m-j-e-t.  They threaded

21       the ink jet coaters and --

22     BY MR. BALDWIN:

23  Q.   If you could stop for a moment.  What is an ink jet coater?

24       What is its function on a production line?

25  A.   An ink jet coater -- there are two on each line.  The first

1    one puts an undercoat on the bottom of the bottle, such as the

2    lot number, the date, all the identification used to take a

3    bottle to resale.  And the second one on the back of the line

4    puts a code on the corrugate shipper, saying basically the

5    same thing; the lot, the location it was manufactured, the

6    production date, those things.

7  Q.   All right.  So tell us, please, the nature of the dispute.

8  A.   Basically we kept crashing it and Bill wanted them to come

9       back in and remove their equipment and reimburse us.  They

10      pointed out through their local sales representative, Shannon

11      Williams --

12           MS. WILLIAMS:  I'll object to anything he said.

13      That's hearsay.  Go ahead.

14      BY MR. BALDWIN:

15  Q.   Go ahead and answer the question.  Did you have this

16      discussion with Miss Williams?

17  A.   Mr. Williams.

18  Q.   Mr. Williams.

19  A.   Yes.  Yes.  Bill Hunt had told me to call Shannon Williams and

20      have this equipment removed from Surefil because it wasn't

21      working.  Shannon sent their local technician, I believe his

22      name is Ryan -- I don't know Ryan's last name.  Ryan came in.

23      He told me that he --

24           MS. WILLIAMS:  Objection to hearsay.  Do you want me

25      to just put a recurring objection on?  However you want to

1    handle it.

2           MR. BALDWIN:  You can object ad hoc.  This isn't

3    being introduced for the truth of what he said.  It's to show

4    why the witness acted what he did [sic].  But that's fine.

5           THE WITNESS:  Ryan came in and told me that basically

6    the reason that these pieces of machinery were not working was

7    that we would get shampoo on the laser eye that reads when a

8    bottle is passing over and that that was the reason it didn't

9    work.  So eventually this dispute was resolved.

10    BY MR. BALDWIN:

11  Q.    Did you pass that information to Mr. Hunt?

12  A.    Yes, I did.

13  Q.    And what was Mr. Hunt's response when you passed that

14    information to him?

15           MS. WILLIAMS:  Objection, hearsay.

16           THE WITNESS:  "Can we get this piece of equipment

17    working and can we keep it working?"  And eventually we did.

18    BY MR. BALDWIN:

19  Q.    Okay.

20  A.    So the dispute was resolved.

21  Q.    So Domino Amjet did not take away their equipment?

22  A.    Correct.

23  Q.    Were there any other disputes relating to line one?

24  A.    Not to the best of my recollection.

25  Q.    Now, do you recall a time when Surefil contemplated putting

1        into place a second production line?

2  A.     Yes.

3  Q.     And were you involved in the process of procuring that second

4        production line?

5  A.     Yes.

6  Q.     Specifically did you contact either directly or indirectly any

7        manufacturers of filler/capper machines to see if they would

8        have an interest in providing the filler/capper machine for

9        line two?

10  A.     They frequently contacted me rather than my contacting them.

11  Q.     Did your company -- did you -- or excuse me. Did you speak to

12        any representatives of Ronchi?

13  A.     Yes.

14  Q.     Regarding the possibility of putting in --

15  A.     We actually issued Ronchi a purchase order for the second

16        line.

17  Q.     When did that occur?

18  A.     It would have been probably late July or early August of

19        2006.

20  Q.     Was that purchase order followed up on?

21             MS. WILLIAMS: Objection to form.

22             THE WITNESS: Followed up on? Was there a machine

23        built?

24        BY MR. BALDWIN:

25  Q.     Well, were you involved in the process of sending a purchase

1   order?

2  A.   No.  Not to Ronchi.  I was involved in cancelling the purchase

3       order to Ronchi.

4  Q.   Well, when did that occur, the cancellation?

5  A.   The cancellation?  September of 2006.

6  Q.   And what was your involvement in that cancellation?

7  A.   Bill and -- Bill Hunt and I were there in the middle of the

8       night one night, probably 11:00, 12:00 at night, and we wrote

9       a letter, saying, "This is the formal cancellation of this

10      purchase order."  I don't remember what the reason was we

11      stated on it.  And then we faxed it to Ronchi's office in

12      New Jersey.

13 Q.   Did you fax it?

14 A.   Yes.

15 Q.   Did you receive any feedback from Ronchi as a result of that

16      cancellation?

17 A.   Their representative, Frank Schigg, S-c-h-i-g-g, called the

18      next morning to confirm that he very much had gotten it and

19      what was going on.

20 Q.   Did you speak with him?

21 A.   No, Bill did.  I sat in the office.

22 Q.   So you listened to the conversation?

23 A.   Correct.

24 Q.   What did Mr. Hunt tell him was the reason for the

25      cancellation?

1  A.    That Ronchi --

2           MS. WILLIAMS:  Objection, hearsay.

3           THE WITNESS:  That Ronchi could not provide us with a

4      machine adequate to perform our workload.

5      BY MR. BALDWIN:

6  Q.    Now, at that time, was Surefil considering purchasing a

7      different machine from a Ronchi machine?

8  A.    Yes.

9  Q.    And what was the company and the machine that Surefil was

10      considering?

11  A.    The ACMA machine.

12  Q.    And do you recall a time when you met with a John Bowerman?

13  A.    Yes.

14           MS. WILLIAMS:  Object.

15      BY MR. BALDWIN:

16  Q.    Who is Mr. Bowerman?

17  A.    Mr. Bowerman is the -- either vice-president or president of

18      sales and general manager of ACMA USA.

19  Q.    And how did you link up with Mr. Bowerman?

20  A.    We got -- IPM was the -- what do you call it?  They're an

21      authorized dealer or something of ACMA filling machinery and

22      they brought up the idea of us buying this.  And, obviously,

23      when buying an $800,000 piece of machinery, you probably like

24      to meet someone from the company, too.  So Bowerman came to

25      Grand Rapids to meet with us.

```
 1  Q.   If I can go back for a moment.  I don't know if I asked you

 2       how the IPM -- the dispute with IPM ended up being resolved.

 3  A.   Bill told me not to respond to any more e-mails or phone calls

 4       from anyone at IPM.

 5  Q.   And was that before or after IPM was making the suggestions to

 6       take a look at the ACMA machine?

 7  A.   This was well after.

 8  Q.   Now, can you recall how many times you met with Mr. Bowerman

 9       regarding the ACMA machine?  Excuse me.  This was prior to the

10       decision to purchase the machine.  That's the time frame.

11  A.   A handful.  Not a large amount.  But probably three, four,

12       five times.

13  Q.   And was this at Surefil's plant?

14  A.   Yes.

15  Q.   In Grand Rapids?

16  A.   Uh-huh.

17  Q.   Do you recall receiving from Mr. Bowerman quotations; that is,

18       terms on which ACMA might be willing to sell that machine to

19       Surefil?

20  A.   Numerous.

21            MR. BALDWIN:  I'll ask the court reporter, please, to

22       mark this as Chism Exhibit Number 1.

23            (Marked for Identification - Ex. No. 1)

24            MS. WILLIAMS:  For one exhibit?

25            MR. BALDWIN:  Both documents are one exhibit.
```

1      BY MR. BALDWIN:

2    Q.    Mr. Chism, I'm handing you what has been marked as your

3          Exhibit Number 1, and would you agree that they constitute a

4          September 29, 2006 letter to you from John Bowerman and then a

5          quotation?

6    A.    Yes.

7    Q.    Do you recall getting these documents?

8    A.    Yes, I do.

9    Q.    And were you the purchasing auditor of Surefil in or about

10         September 29, 2006?

11   A.    Yes, I was.

12   Q.    Did you receive this letter?

13   A.    Yes, I did.

14   Q.    And did you review the quotation that is attached to it?

15   A.    Yes, I did.

16   Q.    Now, prior to the time -- strike that.

17              The first paragraph of the letter says, "It was a

18         pleasure to meet you and Bill Wednesday, September 28th to

19         review the terms of sale of an ACMA," and he uses the word

20         "mononbloc," but I think he probably meant monobloc, "filler

21         and capper machine." Do you see that in the first two lines?

22   A.    Yes.  Oh, yeah.  I'm sorry.

23   Q.    Do you recall a meeting with Mr. Bowerman at Surefil on

24         September 28?

25   A.    Yes, I do.

1   Q.     Was Mr. Hunt at that meeting?

2   A.     Yes, he was.

3   Q.     And did you review terms and conditions of a proposed sale by

4        ACMA to Surefil at that time?

5   A.     Rigorously.

6   Q.     And if you would turn to the last page of Exhibit Number 1,

7        which is terms and conditions.  Do you see that?

8   A.     Yes, I do.

9   Q.     Do you recall a similar document being reviewed by you and

10       Mr. Hunt and Mr. Bowerman at Surefil on September 28 of 2006?

11   A.     Yes, I do.

12   Q.     And do you recall that document having in it terms relating to

13       paragraph 11, "Release and Exclusion of Warranty"?

14   A.     Yes, I do.

15   Q.     And do you recall discussion about the fact that ACMA was,

16       through this document, seeking to exclude all warranties

17       and versibility [sic] or fitness for a particular purpose or

18       consequential damages and the like?

19   A.     Yes.

20   Q.     Was Mr. Hunt aware of that?

21   A.     Yes, he was.

22   Q.     Did Mr. Hunt have the opportunity to review the document that

23       was before him that day?

24   A.     Yes, he did.

25          MS. WILLIAMS:  Objection to the form.

1    BY MR. BALDWIN:

2  Q.  And did Mr. Hunt express to Mr. Bowerman his refusal to accept

3      such terms?

4          MS. WILLIAMS:  Objection to form.

5          THE WITNESS:  No, he didn't.

6    BY MR. BALDWIN:

7  Q.  Now, after you received this letter and the attached quotation

8      from Mr. Bowerman -- first, did you receive it by e-mail?

9  A.  I received -- I couldn't tell you.  I received some by e-mail,

10     I received some by mail.  Some were hand-delivered by ACMA.

11     Some were hand-delivered by Bowerman.

12 Q.  However you got Exhibit 1, did you discuss with Mr. Hunt the

13     contents of that letter and the quotation attached to it?

14 A.  Yes.

15 Q.  Did you receive from Mr. Hunt any authority to proceed at that

16     point with regard to the purchase?

17 A.  Yes.  Not necessarily authority.  We collectively, the two

18     of us -- well, actually, I think there were four of us

19     involved -- went forward with it.

20 Q.  Were you given authority by the company to take any actions

21     with respect to the quotation and the letter from Mr. Bowerman

22     we've just gone over?

23 A.  I was told by Bill Hunt to go ahead and put everything

24     together to get a purchase order ready.  So I told accounting

25     to go forward with it.

1                MR. BALDWIN:  Mark this, please, as Chism 2.

2                (Marked for Identification - Ex. No. 2)

3     BY MR. BALDWIN:

4  Q.   Mr. Chism, you have before you what has been marked as

5       Chism 2.  The reason it says Exhibit C, I will proffer for the

6       record, is this is a copy of Exhibit C to the Complaint filed

7       by ACMA in this case.  Do you recognize this document?

8  A.   Yes, I do.

9  Q.   What is this document?

10  A.   This is the purchase order for the ACMA filler.

11  Q.   Now, if you look -- and was this the purchase order that you

12      caused to be created as a result of the authority granted to

13      you by Surefil?

14  A.   This is the purchase order that I asked Virginia Miller, our

15      accounts payable girl, to create.

16  Q.   And were you responsible for sending this purchase order to --

17  A.   Yes, I was.

18  Q.   -- Mr. Bowerman?

19  A.   I was.

20  Q.   Now, if you look down to terms, do you see the language

21      there "Exacting to quote" and then there is a reference to a

22      quotation?

23  A.   Yes, I do.

24  Q.   What was the purpose of the use of the word "exacting"?

25  A.   Because we were happy with the terms and conditions that we

```
 1        had all agreed upon on the -- that most recent quote.
 2   Q.   And was it your intention in referencing a quotation to
 3        reference the quotation that is included in Exhibit Number 1?
 4   A.   Numbers briefly?
 5             REPORTER:  I'm sorry?
 6             THE WITNESS:  I'm just confirming numbers briefly.
 7             (Short Pause)
 8             THE WITNESS:  Yes.
 9             MR. BALDWIN:  Let's mark this as Chism 3, please.
10             (Marked for Identification - Ex. No. 3)
11        BY MR. BALDWIN:
12   Q.   Mr. Chism, you have before you your Exhibit Number 3, and I
13        will tell you, sir, this is a document that has been produced
14        by Surefil under procedures that are involved in discovery and
15        lawsuits.
16   A.   Uh-huh.
17   Q.   And do you recall getting this e-mail that is before you?
18             (Short Pause)
19             And if it will assist, if you'll see the initials
20        "JB" at the bottom of the second page.
21   A.   Yes.
22   Q.   And is that John Bowerman?
23   A.   I'm kind of confused because John is carbon-copied on the
24        e-mail, but the e-mail is from Neil Adams.
25   Q.   Well, could it be that Mr. Bowerman would be using Mr. Adams'
```

1          MR. BALDWIN:  Just one, Mr. Chism.

2                         *   *   *

3                    RE-EXAMINATION

4     BY MR. BALDWIN:

5  Q.   You talked about the Omron camera and how that

6       problem -- I think you said that the issue was resolved, but I

7       don't think you said or you weren't asked, one or the other,

8       how that issue was resolved.  Did Surefil procure a camera to

9       take its place?

10         MS. WILLIAMS:  Objection to form.

11         THE WITNESS:  To the best of my knowledge there was.

12    BY MR. BALDWIN:

13 Q.   And were you involved in that process?

14 A.   No.  Not as far as I remember.  We had a new purchaser named

15      Susan Weaver at that point in time.

16         MR. BALDWIN:  Thank you.  That's all I have.

17         VIDEOGRAPHER:  We're off the record.  The time is

18      2:46.

19         (Deposition concluded)

20                    *   *   *

21

22

23

24

25

1    STATE OF MICHIGAN)

2                   )  ss

3    COUNTY OF KENT  )

4

5        I, REBECCA S. GRUBBA, Certified Shorthand Reporter and

6    Notary Public in and for the State of Michigan, do hereby

7    certify there came before me the deponent herein, who was by

8    me duly sworn to testify to the truth and nothing but the

9    truth concerning the matters in this cause.

10       I further certify that the foregoing transcript is a true

11   and correct transcript of my original stenographic notes.

12       I further certify that I am neither attorney or counsel

13   for, nor related to or employed by any of the parties to the

14   action in which this deposition is taken; and furthermore,

15   that I am not a relative or employee of any attorney or

16   counsel employed by the parties hereto or financially

17   interested in the action.

18       IN WITNESS WHEREOF, I have hereunto set my hand this 5th

19   day of September, 2008.

20

21                        _____

22                        REBECCA S. GRUBBA, CSR and Notary

23                        Public in and for the County

24                        of Kent, State of Michigan.

25                        My Commission Expires:  12-31-2010

**Kane & Trap Court Reporting, Inc.**
**services@kaneandtrap.com**                    **(616) 742-0700**