# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

ACMA USA, INC.,

    Plaintiff/Counterclaim Defendant,

v.                            **Civil Action No. 3:08CV0071**

SUREFIL, LLC,

    Defendant/Counterclaim Plaintiff.

## EXCERPTS FROM THE DEPOSITION OF
## DAVID SHINN TO BE READ INTO EVIDENCE

Pursuant to the Court's Pretrial Scheduling Order, Defendant, Surefil, LLC, served designated deposition testimony of David Shinn on Plaintiff, ACMA USA, Inc. ("ACMA"), on October 29, 2008, to which ACMA did not object or serve counter-designations.

Defendant hereby submits the designated deposition testimony of David Shinn, which was stenographically recorded on October 27, 2008, to be read into evidence during the trial of this case.

Page 6:

    6    Q    Can you state your name for the

    7  record, please?

    8    A    David Shinn.

    9    Q    What is your occupation?

    10    A    I'm a supply manager in Unilever's

11  contract manufacturing department.

12     Q   And in 2006/2007, were you also in

13  the same position?

14     A   Yes, I was.

15     Q   And can you briefly describe what

16  your responsibilities are in that position?

17     A   I am responsible for sourcing

18  third-party manufacturing services for

19  Unilever, specifically in the area of

20  personal care liquids.

21     Q   Okay.  And in that capacity, did

22  you have the opportunity to discuss such

23  services with a company by the name of

24  Surefil, LLC?

25     A   Yes.

Page 7:

1      Q   And when did those discussions take

2  place?

3      A   I believe they began early to

4  mid-2006.

5      Q   And did they result in any

6  agreements between the parties?

7      A   Yes, there was.

8      Q   You have Exhibit 1 before you, I

9   believe?

10     A   Yes, I do.

11     Q   Is that the contract that was

12  entered into between Surefil and Unilever?

13     A   Yes.

14     Q   And that contract began when?

15     A   The effective date was January 1,

16  2007.

17     Q   And through when?

18     A   The expiration was the end of that

19  same year, December 31, 2007.

20     Q   And generally speaking, that

21  contract was -- what was the purpose of that

22  contract?

23     A   That was to have Surefil produce

24  a -- the identified personal care liquids

25  products for Unilever for that time period.

Page 8:

1      Q   And the amount of production that

2   Surefil was scheduled to produce is found in

3   that contract, correct?

4      A   Yes.  That's an annualized number.

5   Q   Okay.

6   A   Surefil was in the process of
7   adding capacity during the year. So not all
8   of that was achievable in the one-year time
9   frame.

10   Q   Okay. When you say -- and can you
11   tell me where on the contract that annualized
12   section is?

13   A   Yes. That's not specifically
14   spelled out, but that was the intent.

15   Q   All right. Can you look at the
16   page -- the signature page?

17   A   I'm sorry, which page are you
18   referring to, sir?

19   Q   I'm referring to the signature
20   page, which is page 8 on the contract, and
21   I'll ask you to go to the page immediately
22   before that.

23   A   Okay. Bear with me.

24   Q   Sure.

25   A   Yes, I'm there now.

Page 9:

1   Q   Okay. And go to section 1.1,

2   correct?

3     A   Yes.

4     Q   Does that contain the 2007

5   forecast?

6     A   That is the annualized forecast on

7   that page, correct.

8     Q   Okay. And that was what the

9   expectations were for the year 2007 on an

10  annualized basis?

11    A   On an annualized basis once Surefil

12  had the capacity in place, yes.

13    Q   Now, talk to me about what do you

14  mean by Surefil having the capacity in place?

15    A   On January 1st, they only had one

16  production line operational. A second line

17  was due to be up and running March 1st, and

18  then there was a ramp-up for two months

19  beyond that.

20    Q   Okay. Now, did they start

21  producing under the contract in January?

22    A   Yes. They were producing on one

23  line in January, correct.

24    Q   All right. And did the second line

25   come into your knowledge on March 1st?

Page10:

1     A   It was planned.  It was in my
2   knowledge before then, but the line had not
3   been commissioned yet.
4     Q   And do you know when that line was
5   commissioned?
6     A   Yes.  It was commissioned, to the
7   best of my knowledge, sometime in March for
8   the first time.
9     Q   In March?
10    A   Correct.
11    Q   And when did you -- when were you
12  to ramp up?
13    A   We planned a two month ramp-up to
14  get the line to -- to allow them to get the
15  line to full capacity production.
16    Q   And when did that ramp up start?
17    A   It starts directly at the
18  commissions time.
19    Q   Did they ramp up successfully
20  during that period of time?
21    A   No.

22   Q   Did they explain to you why they

23  did not ramp up?

24      A   There was communication as to

25  several reasons, yes.

Page 11:

1       Q   They did explain to you why,

2   though?

3       A   They did express the reasons when

4   we questioned them as to why they were not

5   meeting their goals.

6       Q   And did they continue to -- were

7   they able to meet their goals after that two

8   month ramp-up period?

9       A   No, sir.

10      Q   And what did Unilever do about

11  that?

12      A   In July, I communicated to them

13  that we really couldn't wait any longer and

14  we had to change our production plans for the

15  balance of the year.

16      Q   And is that communication

17  contained, at least in part, in Exhibit 3?

18      A   Yes.  That was how it was

19  formalized, in that e-mail communication,

20  yes.

21     Q   Before I go onto Exhibit 3, I

22  wanted to get you to identify Exhibit 2.

23        Is that a communication that you

24  recall seeing?

25     A   Yes.  That was one of the

Page 12:

1   communications from Surefil.

2      Q   Okay.  Now, let me go to Exhibit 3,

3   if I could.

4      A   Okay.

5      Q   On exhibit 3, you agreed to allow

6   Surefil to lower its production?

7      A   Yes.  Essentially, we modified the

8   scope of the contract, at that point.

9      Q   And the reason that you modified

10  the scope, at that point in time?

11     A   Because they could not meet their

12  service criteria, which was required to

13  remain at the current level.

14     Q   When you say service criteria, do

15  you mean production?

16     A    We measure the performance, the

17  service performed by a KPI known as schedule

18  attainment, how well the company meets the

19  schedule demand that's given to them.

20     Q    Somebody that's -- as somebody

21  that's not in the business, can you explain

22  what you mean by that?

23     A    We schedule them for a certain

24  amount of production each week, and then we

25  measure them based on what they actually

Page 13:

 1  achieve on a percentage basis.

 2     Q    And they could not -- they

 3  apparently were not able to do that on a

 4  percentage basis?

 5     A    They consistently failed against

 6  that, yes.

 7     Q    Did they explain to you why?  And

 8  that's a yes or no question.

 9     A    Yes, they offered some

10  explanations.

11     Q    Okay.  And did they ever meet their

12  attainment goal through the rest of the year

13  on a month-to-month basis?

14     A   I don't have the exact date in

15  front of me, sir, but there was a point when

16  they were able to achieve it, but I do not

17  know the exact date.

18     Q   And the attainment that we're

19  talking about here is the reduced attainment

20  or the reduced reduction, not the original

21  expectation; is that correct?

22     A   Correct.  They were not able to

23  achieve the required attainment until we

24  lowered the demand.

SUREFIL, LLC,

By      /s/      Christine  A.  Williams
           Of Counsel

Bruce M. Marshall, Esquire (VSB #18093)
Christine A. Williams, Esquire (VSB #47074)
DuretteBradshaw, PLC
600 East Main Street, 20th Floor
Richmond, Virginia  23219
Telephone:  (804) 775-6900
Facsimile:  (804) 775-6911
bmarshall@durrettebradshaw.com
cwilliams@durrettebradshaw.com
Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of November, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to:

W. R. Baldwin, III, Esquire
W. Reilly Marchant, Esquire
Marchant, Honey & Baldwin
5600 Grove Avenue
Richmond, Virginia 23226

   /s/   Christine A. Williams
Christine A. Williams, Esquire
DuretteBradshaw, PLC
600 East Main Street, 20th Floor
Richmond, Virginia 23219
Telephone: (804) 775-6900
Facsimile: (804) 775-6911
cwilliams@durrettebradshaw.com